# ROWDYDOW bbQ WORLDWIDE, LLC.

## COPACK AGREEMENT

THIS AGREEMENT is made and executed this 31st day of August, 2015 by and between Fourth Street Barbeque and Packing, Inc ("*Contractor*"), a corporation organized and existing under the laws of the State of Pennsylvania, with a principal place of business at 3 Arentzen Blvd, Charleroi, PA, 15022 and ROWDYDOW bbQ WORLDWIDE, LLC., (the "*Company*"), a corporation organized and existing under the laws of the State of Illinois with a principal place of business at 200 East Randolph, Suite 5100 Chicago, IL 60601.

WHEREAS, Company desires that Contractor produce for Company for distribution, the pork barbecue products set forth in Exhibit I attached hereto to be amended by mutual agreement as new products are introduced and made a part hereof (collectively "*Product*"); and

WHEREAS, Contractor desires to produce such Product for Company at Contractor's Facility, under the terms set forth herein.

NOW, THEREFORE, in consideration of the above, and the mutual covenants and conditions hereinafter set forth, Company and Contractor mutually agree as follows:

## PART 1  SPECIFICATIONS

1.1  Contractor shall mix, process, sample, test, pack, code, store, and handle Product and perform such other services as may be reasonably required by Company to produce and package Product in accordance with Good Manufacturing Practices prevailing in the industry, all applicable laws and regulations and in strict compliance with the specifications, formulas, manufacturing processes, quality control standards, coding requirements and any other standards or guidelines agreed to by Company and Contractor as set forth in a Quality Control Manual (hereinafter the "*Manual*") to be developed by the parties (the "*Specifications*"). Contractor shall implement any changes in the Product formulations and/or Product manufacturing processes as Company may from time to time request in writing. Contractor shall acknowledge in writing its receipt of any such request from Company and provide Company with an itemization of all increases and decreases in costs to produce and package Product, together with written evidence of the same, as a result of such changes. Upon mutual agreement of the parties, the contract conversion price will be adjusted in accordance with such costs increases and decreases as set forth herein.

1.2  Contractor shall prepare and submit to Company quality control records and reports as requested, and shall also furnish to Company without charge a reasonable number of samples from each production run of Product for quality assurance purposes as may be otherwise reasonably requested by Company. Samples provided by Contractor to Company hereunder shall not be used in calculating the loss experiences under any loss allowances set forth herein. Contractor shall perform testing of Product Supplies (as defined in Section 2.1 hereof) and finished Product in accordance with testing methods, procedures and standards set forth in the Manual.

1.3  At any time during the Term of this Agreement, but with at least 24 hours prior written notice, Company shall have the right to send one or more of its authorized employees

and/or representatives to observe and inspect, during Contractor's regular business hours, manufacturing, warehousing and other facilities, including without limitation, the Contractor's Facility, used to produce, package, store and ship Product or used to store Product Supplies. Company's representatives will sign Confidentiality Agreements before entering the plant, and shall have the right to take a reasonable number of samples of Product and Product Supplies during such inspection for quality assurance purposes.

1.4 If any portion of Contractor's Facility, or any of Contractor's processes, inventories or equipment are in an unsanitary condition or do not otherwise comply with the Manual, any and all applicable laws and regulations or with the other terms and conditions of this Agreement, Contractor shall promptly take such action as will correct the deficiencies and bring such processes, inventories and/or equipment into compliance with the Manual, applicable laws and regulations and with the terms and conditions of this Agreement.

1.5 Company, in addition to all other rights and remedies available to it under applicable law, shall have the right at any time, either before or after shipment of Product, to reject Product which has not been produced, packaged, stored or handled in compliance with the Specifications or which is otherwise not in compliance with the terms and conditions of this Agreement ("*Nonconforming Product*"). Specifically, but not by way of limitation, the parties agree that:

(a) Company may reject and refuse to pay for Product which has been produced and packaged during a particular production run if samples from that production run do not conform to the Specifications described in Section 1.1 hereof or are otherwise not in compliance with the terms and conditions of this Agreement;

(b) Company may reject and refuse to pay for Product which (i) has been damaged by Contractor prior to receipt by Company or its shipping agent; (ii) does not fully comply with the Specifications; (iii) does not fully comply with all of the other terms and conditions of this Agreement; or (iv) is otherwise not in a first class merchantable condition due to Contractor's breach of its obligations hereunder; and

(c) Any Product Supplies, work in process or Product rejected by Company and determined by Company not to be reconditionable or salvageable shall be disposed of by Contractor at Contractor's cost and expense (unless the nonconformity or defect in such Product Supplies, work in process or Product is not attributable to any act or omission on the part of Contractor, in which case Company shall bear such costs) in a manner which shall absolutely preclude re-use for animal consumption and is in compliance with the terms of Section 10.1. If Company and Contractor mutually determine that such Product Supplies, work in process or Product are reconditionable or salvageable, Contractor shall remove all Company identification and dispose of the same as mutually agreed in writing between Company and Contractor and provide documented proof of such.

If Company has paid Contractor for Product which is rejected by Company as permitted under Section 1.5, Company shall invoice Contractor for the cost of such Nonconforming Product and for any Product Supplies therefore supplied by Company hereunder and also for any freight, handling and other reasonable disposition costs or expenses incurred by Company in

connection with such Nonconforming Product, and Contractor shall, at Company's election, either pay Company or give Company a credit in the sum of such invoice amount within 30 days of such invoice. No inspection by Company or its agents shall operate as a waiver of or limitation on Company's right to later reject or recall Nonconforming Product under the terms hereof. In the event Contractor has produced or shipped Nonconforming Product, Company may, at any time thereafter, order Contractor to suspend the production and packaging of Product until such time as Contractor has corrected the nonconformity and Contractor shall use all reasonable efforts to correct such nonconformity as soon as commercially practicable.

1.6 Contractor shall notify the Company's director of quality assurance, which may be changed upon written notice from the Company, immediately by telephone of the presence of any Nonconforming Product. Contractor shall promptly identify to Company's director of quality assurance any Product on "hold" beyond normal periods of time as specified in the Manual, and shall comply with the Company's directions regarding the disposition of same.

1.7 At Company's request, Contractor shall, at Contractor's sole cost and expense, provided the nonconformity or defect in the Product subject to seizure, recall, withdrawal or destruction is attributable to any act or omission on the part of Contractor, and in accordance with Company's recall and withdrawal policy set forth in the Manual, promptly perform those tasks required of it under the terms of said policy in connection with (i) any recall or withdrawal of Nonconforming Product initiated by Company; and (ii) any seizure, destruction, recall or withdrawal of Nonconforming Product ordered or recommended by federal, state or local governmental authorities. Contractor shall immediately notify Company's director of quality assurance by telephone and by facsimile, of any situation which could result in the seizure, destruction, recall or withdrawal of Product or of the need for any seizure, destruction, recall or withdrawal of Product. Contractor shall cooperate fully with Company in implementing any seizure, destruction, recall or withdrawal of Product, including without limitation, assisting Company in determining the scope and cause of the Product problem and the location of any shipments of Product. Unless the nonconformity or defect in the Product subject to seizure, recall, withdrawal or destruction is not attributable to any act or omission on the part of Contractor, Contractor shall reimburse Company upon demand for all losses, damages, costs and expenses incurred by Company in connection with its seizure, destruction, recall or withdrawal of such Nonconforming Product, all amounts paid by Company for Product so seized, destroyed, recalled or withdrawn, and Company's cost of Product Supplies (if any) furnished by Company to Contractor and incorporated into such seized, destroyed, recalled or withdrawn Product.

PART 2    PROCUREMENT

2.1 Except as otherwise provided in Exhibit II attached hereto and made a part hereof, Contractor shall have full responsibility for procurement of and payment for all raw materials, ingredients and packaging materials, including labels (collectively, together with any raw materials, ingredients and packaging materials supplied by Company, *"Product Supplies"*) and equipment necessary to produce and package Product for Company under this Agreement. Contractor shall store all Product Supplies in accordance with Good Manufacturing Practices prevailing in the industry and in strict compliance with the terms and conditions set forth in the Manual. Such Product Supplies shall be ordered in quantities mutually agreed to by Company and Contractor and as specified on Exhibit II attached hereto, which shall not be less than the Product Supplies necessary to fulfill the Company's most recent orders. Company will be obligated to purchase or reimburse Contractor for any unused portion of Product Supplies

purchased by Contractor, or which Contractor is obligated to purchase, and necessary to fulfill the immediate forecast by Company and which are not used in the Product as a result of any change in Product Specifications or in the schedule, or otherwise, in each event initiated by the Company, provided that the unused portion is not the result of Contractor negligence. In the event Contractor purchases any Product Supplies, Contractor shall use its best efforts to purchase all Product Supplies at the lowest available cost consistent with Contractor's obligation to produce and package Product which will be in compliance with the Specifications and with the other terms and conditions of this Agreement.

2.2    Contractor shall be responsible for inspecting all Product Supplies, whether furnished by Contractor's suppliers, by Contractor or by Company and shall have final responsibility for rejecting Product Supplies which do not conform with the Manual, the Product Supply specifications therein, and the other terms and conditions of this Agreement. The use of defective or nonconforming Product Supplies in Product will entitle Company to reject such Product. Product Supply specifications shall be established by the Company and set forth in the Manual. Contractor shall have the right to provide recommendations to Company with respect to the Product Supply specifications. If Nonconforming Product is determined to be the result of inappropriate or defective Product Supply specifications, Company shall bear the responsibility and associated costs for such Nonconforming Product under Sections 1.5 and 1.7 of this Agreement.

## PART 3    PRODUCTION SCHEDULING: PALLETS: STORAGE AND HANDLING: SHIPMENT: DOCUMENTS

3.1    Except as otherwise set forth in Exhibit III, Contractor's obligations with respect to scheduling of production, use of pallets, storage, handling and shipment of Product shall be as set forth in Part 3 hereof.

3.2    Unless Company and Contractor mutually agree in writing upon a different procedure, Company agrees to provide Contractor on or before Thursday of each week the Company's production requirements for the upcoming fourteen (14) days. Each such schedule shall include a binding production commitment for the scheduled fourteen (14) day period. Company's obligations under Section 2.1 with respect to Product Supplies shall apply only to the binding period of the schedule provided under this Section 3.2. Company agrees to plan monthly production based upon Contractor's stated maximum units (or equivalent) per month (20 work days), but reserves the right to request that Contractor produce in excess of this amount; provided, however, that it shall not constitute any breach of Contractor's obligations hereunder, if Contractor is not able to accommodate Company's request to produce in excess of their stated maximum units in a month (20 work days).

3.3    Unless Company and Contractor mutually agree in writing upon a different procedure, shipping for the Product shall be arranged and paid for by Company. Product shall be picked up for shipping at Contractor's plant located at Fourth Street BBQ, 3 Arentzen Blvd, Charleroi, PA. 15022 ("*Contractor's Facility*"), or such other location as the Product may be stored by Contractor pending shipping pursuant to the provisions below. On a weekly basis, Contractor shall notify Company, via electronic message, of (a) the quantity of Product produced, (b) the quantity of Product shipped, (c) the quantity of Product Supplies received, and (d) the quantity of Product Supplies used by Contractor each day during such period. The parties agree that time is of the essence with respect to dates of delivery hereunder.

3.4 Contractor shall maintain sufficient Product and Product Supplies inventories to meet shipment schedules provided by Company under Section 3.3. At all times during the Term hereof, Contractor shall ensure that it has adequate production capacity in Contractor's Facility to accommodate the production of Product in quantities set forth in production schedules provided by Company under Section 3.2.

3.5 Unless Company and Contractor mutually agree in writing upon a different procedure, Contractor shall pack Product for shipping unitized in a pallet pattern specified in the Manual. Contractor shall utilize only pallets in good structural and sanitary condition. Contractor shall label all shipments of Product with Contractor's and Company's lot and production codes.

PART 4    PRICES: INVOICING OF PRODUCT AND PAYMENTS

4.1 For Product which has been produced and packaged by Contractor in compliance with the terms and conditions of this Agreement, Company shall pay to Contractor prices based on the pricing schedule as set forth in Exhibit IV. Contractor shall be required to, on a quarterly basis, review with the Company all cost increases and decreases resulting from supportable market price changes in ingredients, packaging or any other appropriate costs. Upon mutual agreement of the parties, which the parties agree to negotiate in good faith, the contract price will be adjusted in accordance with such cost increases and decreases; provided however, that any adjustments to the contract price shall be effective from the date of adjustment forward and no retroactive adjustments to the contract price shall be made. Before such agreement is reached, Contractor shall provide Company with an itemization of the Contractor's costs, together with written evidence of the price increases and decreases incurred by Contractor (i.e., copies of rate increase letters).

4.2 Contractor shall invoice Company for Product at the conclusion of each production week. Invoices are due and payable within 15 days from the date of the invoice.

4.3 Other payment issues are addressed on Exhibit IV, which may be modified from time to time with the written approval of each party.

PART 5    RISK OF LOSS

5.1 Each party shall bear sole responsibility for all risk of loss or damage to any Product or Product Supplies while the same are in its care, custody or control.

5.2 All Product Supplies furnished by the Company and all Product derived in whole or in part from Product Supplies furnished by Company shall be and remain the property of Company until Company sells or otherwise disposes of such Product.

5.3 Risk of loss or damage to Product shall remain with Contractor until the same is removed from the Contractor's Facility by Company's shipping agent in accordance with the terms and conditions of this Agreement. Contractor shall assume full responsibility for, and indemnify and hold Company harmless from and against, any loss or damage to Product Supplies and Product in the care, custody or control of Contractor.

PART 6    TERM

6.1    This Agreement shall become effective on the date first above written, and, subject to Parts 14 and 15 hereof, shall continue in effect for a term of two years, and shall be automatically renewable for additional consecutive one year terms unless terminated by either party upon 90 days prior written notice to the other (the "*Term*").

6.2    The representations, warranties and guarantees of Contractor and Company, and confidential information provisions of Part 8 contained in this Agreement shall survive the termination or cancellation of this Agreement for a period of one year.

6.3    Following the termination of this Agreement, all right, title, and interest to the Company Product, Company recipes and Company formulations shall revert solely to Company, as more fully described in Part 8. Company agrees to purchase all Products in progress at the time of termination, and will buy any Product Supplies purchased by Contractor to fill Company orders, but not in excess of those commercially reasonably necessary to fulfill the Company's most recent 30-day forecast.

PART 7    RECORDS AND AUDITS

7.1    Contractor shall prepare, maintain and retain complete and accurate books and records relating to the production, packaging, testing, storage, receipt and shipment of Product Supplies and Product, rejected Product, and production code accountability records, including Product shipments to Company, as reasonably required by Company. Contractor shall also prepare, maintain and retain any other records required to be maintained under this Agreement or required to be kept by federal, state or local laws and regulations.

7.2    All books and records prepared, maintained or retained by Contractor pursuant to this Agreement shall be made available to Company and its representatives for inspection, either during or after the Term hereof, upon at least 24 hours prior written notice at any time during Contractor's regular business hours. All such records shall be retained by Contractor for a period of at least three years, or longer if so required by federal, state or local laws or regulations or if requested by Company.

PART 8    CONFIDENTIAL AND PROPRIETARY INFORMATION

8.1    Except as otherwise provided in the third sentence of this Section 8.1, at all times the product formulations, specifications and processes listed in Section 1.1, (Product Supply Specifications established under Section 2.2), for the production of the Product, recipes for the Product, and all modifications, improvements and enhancements thereto (collectively, "*Company Materials*"), will be deemed proprietary and confidential information of Company, provided that such Company Materials were previously owned by the Company or independently created by the Company without the involvement of the Contractor. Company Materials shall not be used, disclosed or modified by Contractor except in connection with the production and packaging of Product for Company hereunder and subject to the confidentiality provisions of this Agreement. At all times, product formulations, processes for production, and recipes previously owned or independently created by Contractor, whether in connection with the production of the Product or otherwise, will be deemed proprietary and confidential information of Contractor, and shall not be used by Company unless agreed to in writing by Contractor. Nothing in this Agreement shall prohibit Contractor from continuing to distribute products already developed

333963_3.DOC                                    6

and marketed by Contractor at the time of entering into this Agreement. At all times, the Company shall have the exclusive right to market and distribute all Product that has been marketed by the Company during the Term of this Agreement, but both parties will continue to be bound by the confidentiality provisions herein.

8.2 All business and technical information, whether in written, oral or electronic form, including, but not limited to technical know-how, the formulations, instructions and procedures, which either party at any time prior to the date hereof has disclosed or may hereafter disclose to the other party or to any employee, agent or representative of the other party, including, without limitation, the Company Materials, shall be received and retained by the receiving party and its employees, agents and representatives as strictly confidential and, except as provided for herein, may not be disclosed to any third party. Neither party shall disclose any such information belonging to the other party to any person within its organization or any Affiliate Organization or any third party not having a need to know the same and not agreeing to be bound by the confidentiality provisions of this Agreement and shall only use, and shall cause any person in its organization or Affiliate Organization or third party to only use, such information in connection with the production, packaging and storage of Product. An "*Affiliate Organization*" means, with respect to a person, any other person directly or indirectly controlling, controlled by or under common control with such person.

8.3 Contractor agrees to treat all of Company's proprietary and confidential information with the same degree of care as Contractor affords to Contractor's own proprietary and confidential information, but in no event less than reasonable care. Contractor shall require all third parties gaining access to Company Materials or entering Contractor's manufacturing, warehousing and other facilities to sign Confidentiality Agreement before doing so, whether or not such third parties come into physical or visual contact with the Specifications, any Product or any Product Supplies. Company agrees to treat all of Contractor's proprietary and confidential information with the same degree of care as Company affords to Company's own proprietary and confidential information, but in no event less than reasonable care. Company shall require all third parties gaining access to Contractor's proprietary and confidential information to sign a Confidentiality Agreement before doing so.

8.4 Neither party shall have an obligation of confidentiality with respect to information which:

(a) was in the public domain at the time of receipt from the developing party, or which thereafter comes into the public domain without breach of an obligation assumed hereunder; or

(b) was known and can be shown to have been known by the receiving party at the time of receipt from the disclosing party and was not previously acquired directly or indirectly from the disclosing party on a confidential basis; or

(c) becomes known to the receiving party on a non-confidential basis through a third party whose own acquisition and disclosure were entirely independent of the receiving party, not in breach of any obligation hereunder and not obtained on a confidential basis from the disclosing party; or

(d) is approved for disclosure by the disclosing party in writing.

8.5   All originals and copies of documented business and technical information identified or reasonably identifiable as confidential or proprietary to the disclosing party, including but not limited to the formulations and the Manual, shall be and remain the exclusive property of the disclosing party at all times and shall be returned to the disclosing party upon demand or, if no demand is made, upon the cancellation or termination of this Agreement.

8.6 Contractor acknowledges the confidentiality and importance of Company Materials and shall not disclose or deal in Company Materials during the Term for any purpose other than its obligations hereunder.

PART 9    PURE FOOD GUARANTEE

9.1   Contractor guarantees that all Product produced and packaged for Company hereunder shall be, as of the date of shipment of such Product, not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended (the "Act") and will not be an article which may not, under the provisions of section 404, 405 or 512 of the Act, be introduced into interstate commerce. Contractor further guarantees it will adhere to all microbiological standards incorporated into the Manual, as well as to Good Manufacturing Practices.

PART 10    COMPLIANCE WITH LAWS

10.1   Contractor shall comply with all applicable federal, state and local laws and regulations and Contractor agrees that all Product shall be produced, labeled, and packaged, and all Product and Product Supplies shall be stored, under sanitary conditions and in strict compliance with all applicable federal, state and local laws, regulations and guidelines.

PART 11    TRADEMARKS AND TRADE NAMES

11.1   All Product shall be packaged under trademarks owned by Company and/or any third party trademarks licensed to Company, at the sole discretion of the Company.

11.2   Contractor and Company agree that, as between Contractor and Company and each of their respective Affiliate Organizations, all trademarks identified by Company as being owned by Company are valid and existing trademarks of Company, and are the sole and exclusive property of Company and all trademarks identified by Contractor as being owned by Contractor are valid and existing trademarks of Contractor and are the sole and exclusive property of Contractor. Nothing in this Agreement shall give or is intended to give either party hereto, or any of their Affiliate Organizations, any right, title or interest in or to (a) any trademarks of the other party, any trademark licensed to either party or any, third party trademark designated by the parties for Product, (b) any other trade name used with respect to Product, (c) any trade dress used by other parties, whether or not a trademark; or (d) the goodwill associated with any such trademark, trade name or trade dress, except the right to use the same in strict accordance with the terms and conditions of this Agreement. Neither any party or any Affiliate Organization shall contest the validity or ownership of any trademark of the other party described in Section 11.1 or 11.2 or assist others in contesting the validity or ownership of any such trademark.

11.3   Each party shall promptly notify the other, in writing, of any infringement or potential infringement of any trademark described in Section 11.1 of which that party becomes

aware. Without the express written permission of the trademark owner, the other party shall have no right to bring any action or proceeding relating to such infringement or potential infringement or which involves, directly or indirectly, any issue, the litigation of which may affect the interest of the owning party. Nothing in this Agreement shall obligate the owning party to take any action relating to any such infringement or potential infringement. Additionally, the other party shall promptly notify the owning party, in writing, of any claim or allegation of which the owning party becomes aware that the use of any trademark described in Section 11.1 as authorized hereunder infringes on a third party trademark.

11.4 Neither the non-owning party nor any of its Affiliate Organizations shall adopt any trademark, trade name, trade dress, labeling or packaging which, in the owning party's determination, is deceptively similar to or likely to cause confusion with any trademark or trade dress described in this Part 11 of this Agreement or with respect to Product. Upon receipt of notice from the owning party that the non-owning party or any of its Affiliate Organizations has violated the terms of this Section 11.4, the non-owning party shall take immediate action to discontinue the use of such trademark, trade name, trade dress, labeling or packaging or shall cause its Affiliate Organization(s) to do so.

11.5 Each party, as the owner of trademarks described in Section 11.1, agrees to indemnify, defend and hold harmless the other party from and against any and all liability resulting from any claim of infringement relating to the use by the non-owning party of a trademark described in Section 11.1 in a manner authorized by this Agreement. The parties' obligation to each other under the preceding sentence shall be conditioned on the non-owning party giving the owning party prompt notice of any such claim of infringement. The owning party shall have the sole authority to conduct the defense of and settle any action, proceeding or claim relating to such infringement or claim of infringement with the understanding, however, that the other party may retain additional counsel at its expense and participate in any such action, proceeding or claim.

11.6 The parties agree that the owning party shall determine all printed matter on packaging materials and labeling utilized pursuant to this Agreement and containing an owned trademark. The parties agree not to affix any label or other printed material on Product which either has not been provided to the owning party by the other party or for which the other party has not received the prior written approval from the owning party.

PART 12   WARRANTY AND INDEMNITY

12.1 In addition to all other representations and warranties provided by law or set forth in this Agreement, Contractor warrants and represents to Company that all Product produced, packaged, stored or shipped for Company under this Agreement shall comply with all applicable federal, state and local laws and regulations and shall comply with the terms and conditions of this Agreement, including the specifications as listed in Section 1.1 and guaranteed in Part 9, and shall be wholesome, merchantable, and fit for human consumption. Contractor also warrants and represents to Company that Product packaging supplied by Contractor shall be adequate for normal shipping and storage of Product.

12.2 Product which does not comply with the warranty set forth in Section 12.1 may be rejected by Company pursuant to the terms of Section 1.5 above. Contractor shall indemnify, defend and hold Company harmless from and against any and all liability, loss or damage, cost

or expense (including court costs and reasonable attorneys fees) arising out of or resulting from a breach of such warranty, or a breach of any of Contractor's other obligations under this Agreement.

12.3 Company warrants that it owns or licenses the Trademark(s) to be utilized on Product packaging, and that it owns or has the rights to utilize the recipes, formulations and Product specifications as listed in Section 1.1 for the Product, and that it will indemnify and hold Contractor harmless from any claims, actions, or suits brought against Contractor as a result of Contractor's use of Company's Trademark(s), recipes, formulations or for any breach of any of Company's other obligations under this Agreement.

PART 13    FORCE MAJEURE

13.1 Either party shall be excused from performance under this Agreement while and to the extent that such performance is prevented by an Act of God, strike or other labor dispute, war or war condition, riot, civil disorder, government regulation, embargo, fire, flood, accident or any other casualty beyond the reasonable control of such party. In the event that either party shall be unable to perform any of its obligations as undertaken, it shall promptly advise the other party of its inability to perform. In the event such inability of one party to perform shall continue for a period of 30 days, the other party shall have the right to terminate this Agreement on ten-days prior written notice.

PART 14    RELATIONSHIP

14.1 The relationship which Contractor holds as to Company is that of an independent contractor. This Agreement is not intended to create and shall not be construed as creating between Company and Contractor the relationship of principal and agent, joint venturers, partners or any other similar relationship, the existence of which is hereby expressly denied, nor shall Contractor be considered in any sense an affiliate or subsidiary of Company. Contractor shall not have any authority to create or assume in Company's name or on its behalf any obligation, expressed or implied, or to act or purport to act as Company's agent or legally empowered representative for any purpose whatsoever. Neither party shall be liable to any third party in any way for any engagement, obligation, commitment, contract, representation, transaction or act or omission to act of the other, except as expressly provided herein.

14.2 Contractor shall have exclusive control over production, packaging and storage of Product designated to be produced by Contractor and shall direct and be responsible for the performance of all operations at Contractor's Facility. Contractor shall retain exclusive legal responsibility for the performance of and compliance with all of the terms and conditions of this Agreement which are to be performed or complied with by Contractor.

14.3 Subject to the requirement stated in Section 1.1 that any changes in the Specifications must be in writing, Company's employees may provide consultation services, including without limitation consultation regarding operational improvements or productivity gains with respect to the production of Product, to Contractor. Such services are of an advisory nature only and are rendered without any liability whatsoever on the part of Company, or Contractor.

PART 15    TERMINATION

15.1   Company reserves and Contractor hereby agrees that Company shall have the right to immediately terminate this Agreement under the following circumstances:

(a) Where Contractor has failed to perform or comply with any term, condition, representation, warranty, guarantee or covenant hereof and (except as otherwise set forth in paragraphs (b) and (c) of this Section 15.1, where Company's right to terminate is not conditioned upon its providing Contractor an opportunity to cure) has failed to cure such nonperformance or noncompliance within 30 days after receipt of written notice of such failure from Company; or

(b) Where (i) Contractor fails to vacate an involuntary bankruptcy, insolvency or reorganization petition or petition for an arrangement or composition with creditors filed against Contractor within 30 days after the date of such fling, or files such a petition on a voluntary basis, or (ii) Contractor makes an assignment for the benefit of creditors, or (iii) Contractor fails to vacate the appointment of a receiver or trustee for Contractor or for any interest in Contractor's business within 30 days after such appointment, or (iv) Contractor permits an attachment to be levied against and remain outstanding on any of its equipment or its Facility for more than 30 days, or (v) Contractor's interests or rights under this Agreement, or any part thereof, pass to another by operation of law in violation of Section 18.1, or (vi) Contractor ceases to do business as a going concern or ceases to conduct its operations in the normal course of business, or (vii) Contractor substantially changes the nature of its business or there is a substantial change in the ownership of Contractor or any entity which, either directly or indirectly, owns or controls Contractor, and such change is likely to result in a material adverse effect on Company; or

(c) Where Contractor has knowingly adulterated any Product or has otherwise knowingly violated the provisions of Part 9 above, or has knowingly substituted or added, with respect to any instruction, specification, formula, manufacturing process or quality control standard or any procedure set forth in this Agreement or any exhibit hereto, an ingredient, component, process or procedure not called for thereby without the consent of Company, or has altered or omitted an ingredient, component, process or procedure called for thereby without the consent of Company.

(d) Where the Company has entered into an agreement in which it agrees to merge or consolidate with a third party, or sell substantially all its assets to a third party (or similar transaction).

15.2   Contractor agrees to provide notice to Contractor immediately upon the occurrence of any event referenced in paragraphs (a)-(c) above or of any event which, with the passage of time could result in an event referenced in paragraphs (a)-(c) above. The termination rights granted under this Section 15.1 are cumulative with and in addition to any other rights or remedies to which Company may be entitled arising from any violation, default or breach of this Agreement.

15.3   Contractor agrees that, upon the occurrence of any of the events set forth in Section 15.1, after the expiration of any applicable grace period, Company may, at its sole

333963_3.DOC                                                        11

option, elect to terminate this Agreement (a) immediately upon Company's written notice of termination to Contractor or (b) at any time prior to the expiration of Company's most recent 30-day forecast upon Company's written notice of termination setting forth such termination date, it being understood that during the period referenced in subparagraph (b) hereof, Contractor shall continue to produce, package, and store Product for Company in accordance with the terms and conditions of this Agreement.

15.4 Contractor reserves and Company hereby agrees that Contractor shall have the right to immediately terminate this Agreement under the following circumstances:

(a) Where Company fails to make any payment due to Contractor hereunder within ten days after receipt of written notice of such failure, unless the amount in issue is subject to a bona fide dispute between the parties; or

(b) Where (i) Company fails to vacate an involuntary bankruptcy, insolvency or reorganization petition or petition for an arrangement or composition with creditors filed against Company within 30 days after the date of such filing, or files such a petition on a voluntary basis, or (ii) Company makes an assignment for the benefit of creditors, or (iii) Company fails to vacate the appointment of a receiver or trustee for Company or for any interest in Company's business within 30 days after such appointment, or (iv) Company permits an attachment to be levied against and remain outstanding on a substantial portion of its assets for more than 30 days, or (v) Company ceases to do business as a going concern or ceases to conduct its operations in the normal course of business; or

(c) Where Company has failed to perform or comply with any term or condition hereof and has failed to cure such nonperformance or noncompliance within 30 days after receipt of written notice of such failure by Contractor.

15.5 Any failure by either party to notify the other party of a violation, default or breach of this Agreement, or to terminate this Agreement on account thereof, shall not constitute a waiver of such violation, default or breach or a consent, acquiescence or waiver of any later violation, default or breach, whether of the same or a different character.

15.6 Upon termination or cancellation of this Agreement, the rights granted hereunder shall immediately become null and void, and Contractor shall discontinue all use of the trademarks and trade names referred to in Part 11 hereof and shall return to Company within 30 days from the date requested all originals and copies of the information subject to Part 8 hereof, including, but not limited to all written materials relating to the specifications listed in Section 1.1, and all label artwork and plates, without retaining any copies of any of the foregoing, but such termination or cancellation shall not affect any obligation of, or liability incurred by, either party prior to such termination or cancellation.

15.7 Upon termination or cancellation of this Agreement for any reason, Contractor shall immediately cease performing any and all services hereunder; provided, however, that if (and for so long as) Company has paid all amounts due to Contractor hereunder, Contractor (a) shall continue to provide services hereunder with respect to orders and work in progress which Company may request be completed, and (b) shall deliver to Company, within a reasonable period of time (but not to exceed 30 days), all conforming Product Supplies and Product owned

by Company or for which Company has paid or has agreed to pay, as well as all other property of Company in the possession, custody or control of Contractor.

PART 16   INSURANCE

16.1   Contractor shall, at its cost, procure and maintain from and throughout the Term hereof, the following coverage from an insurance carrier with an AM Best rating of at least "A 15":

(a)   Worker's Compensation Insurance providing statutory benefits and Employer's Liability Insurance with limits of not less than $1,000,000.00; and

(b)   Comprehensive General Liability Insurance including Contractual Liability, Fire Legal Liability and Product Liability Coverage (with the Broad Form Vendor's Endorsement naming Company as an additional insured) with Bodily Injury Limits of not less than $5,000,000.00 combined single limit per occurrence.

16.2   Contractor shall submit policies and/or certificates of insurance evidencing the above coverage (which shall include an agreement by the insurer not to cancel or materially alter its coverage except upon 30 days prior written notice to Company) to Company for its approval before entering into performance of this Agreement. The coverage provided by Contractor hereunder shall be primary and non-contributing with any similar insurance which may be maintained or provided by Company, and any certificate furnished by Contractor shall be endorsed to so state.

16.3   Product Liability Coverage shall continue in effect for Company's benefit for a period of one year from the date of last delivery of Product to Company. In case of Contractor's failure to maintain the required insurance in effect, Company may, at its option, immediately terminate this Agreement, or procure the aforementioned insurance and charge Contractor for the amount so expended by Company.

PART 17   NOTICES

17.1   Any notice or other communication required or permitted to be given pursuant to this Agreement shall be deemed to have been sufficiently given if in writing and either delivered by facsimile (with electronic receipt), which shall be effective the day of confirmed delivery, overnight courier service (such as DHL, for example) against receipt, which shall be effective the day of confirmed delivery; or sent by registered or certified U.S. mail, return receipt requested, addressed as indicated below:

(a)   If to Contractor:

Mr. Dave Barbe
Fourth Street Barbecue and Packing, Inc.
3 Arentzen Blvd
Charleroi, PA 15022
Attention: Dave Barbe

With a copy to:

(b)     If to Company:

        Angela Keaveny
        ROWDYDOW bbQ WORLDWIDE, LLC
        200 East Randolph, Suite 5100
        Chicago, Illinois  60601
        Attention:  Angela Keaveny

        With a copy to:

        Attorney

Either party may, by notice as aforesaid, designate a different address for notices or other communications intended for it.

## PART 18     MISCELLANEOUS

18.1     Neither party may assign, convey or transfer this Agreement or any interest therein or undertake any transaction or series of transactions which would result in a transfer of this Agreement or any interest therein, or sublicense or assign any rights or obligations hereunder, or delegate or subcontract performance of any obligations hereunder, in whole or in part, to any third party to parties without the prior written notice to the other; provided, however, that a party may assign this Agreement and its interest therein (by operation of law or express assignment) to any third party who is the survivor in a merger involving such party or who acquires all or substantially of the assets of such party. Notwithstanding the foregoing, neither party may assign this Agreement to any third party that is a competitor of the other party hereto. The holder or holders through assignment, transfer or conveyance of this Agreement or any interest therein shall be bound by all of the terms and conditions hereof.  No transfer or assignment of this Agreement to any third party shall relieve the original party to this Agreement from any obligations hereunder without the written consent of the other party.

18.2     If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the validity and enforceability of the remaining terms, provisions, covenants and conditions of this Agreement shall not in any way be affected, impaired or invalidated.

18.3     Failure of either party hereto to enforce any of the provisions of this Agreement or any rights with respect thereto shall in no way be considered to be a waiver of such provisions or rights or in any way affect the validity of this Agreement.

18.4   The headings and captions contained herein are inserted for convenience only and shall not be deemed to have any substantive meaning.

18.5   This Agreement shall be governed by the laws of the state of Illinois. If any portion of this Agreement shall be deemed to be invalid or unenforceable, the remainder shall be valid and enforceable to the maximum extent permitted by law.

18.6   In any action brought by a party hereto to enforce the obligations of any other party hereto, the prevailing party shall be entitled to collect from the other parties to such action such party's reasonable attorneys' and accountants' fees, court costs and other reasonable expenses directly related to such litigation.

18.7   Except for the Confidentiality Agreement entered into between the parties attached hereto as <u>Exhibit V</u> and incorporated herein by reference, this Agreement constitutes the entire understanding between the parties relating to the production and packaging of Product and supersedes and cancels any and all previous contracts or agreements between the parties with respect thereto. If any term of this Agreement conflicts with any term of any purchase order, acceptance or acknowledgment form, this Agreement shall control. This Agreement may not be altered, amended or modified except by a written instrument executed by a duly authorized officer of Company and Contractor. This Agreement may be executed in counterparts, each of which shall be deemed an original and which together shall be one and the same document.

*[Remainder of page intentionally left blank. Signature page follows immediately.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly and lawfully authorized officers or legal representatives effective as of the day and year first above written.

ROWDYDOW bbQ, LLC

By: _____
Angela Keaveny / ROWDYDOW bbQ

Title: _____

FOURTH STREET BARBECUE, Inc.

By: _____
Dave Barbe / Fourth Street Barbecue

Title: _____

## EXHIBIT I

## PRODUCTS TO BE PRODUCED BY CONTRACTOR

| PRODUCT NAME & SKU | DESCRIPTION |
|---|---|
| 1. ROWDYDOW PORK SWEET VINEGAR BBQ 2-80 oz / 110583 | 1 Case of 2-5LB bags smoked pulled pork - sauced |
| 2. ROWDYDOW PORK BBQ NO SAUCE 2-80 oz / 110606 | 1 Case of 2-5LB bags smoked pulled pork |
| 3. SMOKED BEEF BRISKET WHOLE UNSAUCED SEASONED VAR WGT 1-8.5 LB / 50002 | 1 Case BF BSKT 10LBS |

*[Remainder of page intentionally left blank.]*

333963_3.DOC

17

## **EXHIBIT II**

PROCUREMENT/SUPPLIES/AND EQUIPMENT

A.    <u>Materials Supplied by Company</u>: NONE

B.    <u>Product Supply Quantities</u>: NA

C.    <u>Payment Mechanism for Product Supplies</u>: NA

*[Remainder of page intentionally left blank.]*

## EXHIBIT III

### PRODUCTION SCHEDULING; SHIPPING AND HANDLING

Product Shipping and Handling Specifications

Shipping and handling of all ROWDYDOW bbQ finished goods will be completed in compliance to the ROWDYDOW bbQ Co-Pack / QA Manual as designed and placed by ROWDYDOW bbQ and Fourth Street BBQ QA and production managers. Compliance to this manual is effective immediately and will continue for the term of the Agreement.

*[Remainder of page intentionally left blank.]*

## EXHIBIT IV

PRICING

The following are the agreed to prices for the Products to be produced by the Contractor for the Company pursuant to the terms of the Agreement. All prices represent the conversion cost per packaged unit of Product.

| ITEMS | CONVERSION PRICE / UNIT |
|---|---|
| 1. ROWDYDOW PORK SWEET VINEGAR BBQ 2-80 oz / 110583 | $.89 / Lbs. |
| 2. ROWDYDOW PORK BBQ NO SAUCE 2-80 oz / 110606 | $.89 / Lbs. |
| 3. SMOKED BEEF BRISKET WHOLE UNSAUCED SEASONED VAR WGT 1-8.5 LB / 50002 | $.89 / Lbs. |

*[Remainder of page intentionally left blank.]*